Jordan M. New, Esq.
The Law Office of Jordan Michael New
Attorneys for Defendant
1001 SW 5th Avenue
Suite 1100, #483
Portland, Oregon 97204
P: 503-919-0027
jordan@newlawpdx.com

Brendan H. Little, Esq., *Pro Hac Vice*
Lippes Mathias Wexler Friedman LLP
Attorneys for Defendant
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
P: 716-853-5100
blittle@lippes.com

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| Jillian McAdory,<br><br>Plaintiff,<br>v.<br><br>M.N.S. & Associates, LLC, and DNF Associates, LLC,<br><br>Defendants. | Case No. 3:17-cv-00777-HZ<br><br>DEFENDANT DNF ASSOCIATES, LLC'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56(a)<br><br>Request for Oral Argument |

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

PROCEDURAL BACKGROUND ........ 2

FACTUAL BACKGROUND ........ 3

I. THE COLLECTION SERVICES AGREEMENT ........ 3

II. MNS'S ALLEGED VIOLATIONS OF THE FDCPA ........ 4

ARGUMENT ........ 8

I. SUMMARY JUDGMENT STANDARD

II. FEDERAL COMMON LAW AGENCY PRINCIPLES AND FDCPA ........ 9

III. MNS DID NOT HAVE "ACTUAL AUTHORITY" TO VIOLATE THE FDCPA ........ 10

IV. DNF DID NOT CONTROL THE MANNER AND MEANS OF MNS'S COLLECTION PRACTICES ........ 12

i. The Control Factor ........ 13

ii. The Distinct Occupation Factor ........ 14

iii. The Supervision Factor ........ 15

iv. The Skill Factor ........ 15

v. Tools and Instrumentalities Factor ........ 16

vi. Length of Time Employed Factor ........ 16

vii. The Compensation Factor ........ 16

viii. The Regular Business of the Employer Factor ........ 17

ix. Subject Intent of the Parties Factor ........ 17

x. The Business Factor ..... 18

V. MNS DID NOT HAVE THE "APPARENT AUTHORITY" TO VIOLATE THE FDCPA ..... 18

VI. DNF DID NOT RATIFY MNS'S UNLAWFUL CONDUCT ..... 20

i. Actual Knowledge ..... 21

ii. Willful Ignorance ..... 22

CONCLUSION ..... 27

# TABLE OF AUTHORITIES

**Cases**

*A.B. v. Hilton Worldwide Holdings Inc.*,
2020 WL 5371459 (D. Or. Sept. 8, 2020) .... 10

*Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC*,
2019 WL 6907077, at *1 (N.D. Cal. Dec. 19, 2019) .... 24

*Armstrong v. Investor's Business Daily, Inc.*,
2020 WL 2041935 (C.D. Cal. Mar. 6, 2020) .... 11,14,15,16,17,18,19,26

*Avakina v. Chandler Apts., LLC*,
2015 WL 413813 (D. Or. Jan. 30, 2015) .... 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .... 8

*Clark v. Capital Credit & Collection Servs., Inc.*,
460 F.3d 1162 (9th Cir. 2006) .... 10

*Fenton v. Freedman*,
748 F.2d 1358 (9th Cir. 1984) .... 9

*Fox v. Citicorp Credit Serv., Inc.*,
15 F.3d 1507 (9th Cir. 1994) .... 9

*Hector v. Wiens*,
533 F.2d 429 (9th Cir. 1976) .... 8

*Hernandez v. Spacelabs Med., Inc.*,
343 F.3d 1107 (9th Cir. 2003) .... 8

*Huy Thanh Vo v. Nelson & Kennard*,
931 F.Supp.2d 1080 (E.D. Cal. 2013) .... 9

*Johansen v. HomeAdvisor, Inc.*,
218 F. Supp. 3d 557 (S.D. Ohio 2016) .... 21,24

*Jones v. All American Auto Protection, Inc.*,
2015 WL 7566685 (D. Nev. Nov. 24, 2015) .... 21

*Jones v. Royal Admin. Servs., Inc.*,
887 F.3d 443 (9th Cir. 2018) .... passim

*Knapp v. Sage Payment Sols., Inc.*,
2018 WL 659016 (N.D. Cal. Feb. 1, 2018) .......... 14,16,17

*Kristensen v. Credit Payment Servs. Inc.*,
2015 WL 4477425 (D. Nev. July 20, 2015) .......... 20,23,24,25

*Kristensen v. Credit Payment Servs. Inc.*,
879 F.3d 1010 (9th Cir. 2018) .......... 20,21,22

*Makaron v. GE Sec. Mfg., Inc.*,
2015 WL 3526253 (C.D. Cal. 2015) .......... 21

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) .......... 10

*McAdory v. M.N.S. & Associates, LLC*,
952 F.3d 1089 (9th Cir. 2020) .......... 1,9,20

*Newman v. Checkrite California, Inc.*,
912 F. Supp. 1354 (9th Cir. 1995) .......... 9

*NLRB v. United Ins. Co. of Am.*,
390 U.S. 254 (1968) .......... 16

*NLRB v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*,
124 F.3d 1094, 1099 (9th Cir. 1997) .......... 18

*Oei v. N Star Capital Acquisitions, LLC*,
486 F.Supp.2d 1089 (C.D. Cal. 2006) .......... 9

*Pascal v. Agentra, LLC*,
2019 WL 5212961 (N.D. Cal. Oct. 16, 2019) .......... 19

*Rodgers v. Postmates*,
2020 WL 3869191 (N.D. Cal. Jul. 9, 2020) .......... 21

*Sankovich v. Life Ins. Co. of North America*,
638 F.2d 136 (9th Cir. 1981) .......... 9

*Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*,
622 F. Supp. 2d 890 (N.D. Cal. 2009) .......... 10

*Szajer v. City of Los Angeles*,
632 F.3d 607 (9th Cir. 2011) .......... 8

*United States v. Bonds*,
608 F.3d 495 (9th Cir. 2010) ....................................................................2,12,14

*Warren v. City of Carlsbad*,
58 F.3d 439 (9th Cir. 1995) ........................................................................... 8

**Federal Statutes**

15 U.S.C. § 1692......................................................................................... passim

**Other**

Restatement (Third) of Agency ................................................................... passim

Pursuant to FED. R. CIV. P. 56, Defendant DNF Associates, LLC respectfully moves to dismiss the Second Amended Complaint with prejudice in the above-captioned action. In accordance with LR7-1(a), undersigned counsel represents that they conferred with Plaintiff's counsel on the relief sought by this motion and was informed that Plaintiff disputes the grounds of this motion and intends to oppose it. For the reasons supplied in this motion and memorandum in support of same, DNF Associates, LLC respectfully submits that the Court should grant the motion and dismiss the Second Amended Complaint with prejudice.

## INTRODUCTION

Plaintiff Jillian McAdory ("Plaintiff") initiated this lawsuit over three and one-half years ago when she filed a Complaint, alleging that Defendants M.N.S. & Associates, LLC ("MNS") and DNF Associates, LLC ("DNF") violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq*. ("FDCPA"). (Dkt. 1). Since that time, Plaintiff and DNF vigorously litigated whether DNF – acting as a passive debt buyer – was "debt collector" as defined by the FDCPA. This Court, in its November 3, 2017 Opinion and Order, determined that DNF was not a "debt collector" pursuant to the FDCPA and dismissed Plaintiff's First Amended Complaint against DNF. (Dkt. 27). Plaintiff filed an appeal to the United States Court of Appeals for the Ninth Circuit, challenging, among other things, the Court's ruling that DNF was not a "debt collector" as defined by the FDCPA. The Ninth Circuit, in a two-to-one panel split, determined that DNF, as a passive debt buyer, met the statutory definition of "debt collector" and remanded the case for further proceedings on the issue of vicarious liability. *McAdory v. M.N.S. & Associates, LLC*, 952 F.3d 1089, 1096 (9th Cir. 2020).

Now, before this Court, is DNF's motion for summary judgement seeking dismissal of the Second Amended Complaint. Plaintiff's Second Amended Complaint alleges that DNF is liable

for MNS's unlawful conduct under the theories of actual authority, apparent authority, and ratification. (Dkt. 55, ¶ 26). In support of these allegations, Plaintiff alleges that DNF "had sufficient control over, or retained the right to control or direct, MNS's collection" of Plaintiff's subject debt. *Id.* Additionally, Plaintiff alleges that DNF was "willful ignorant" to MNS's collection practices, and is therefore, liable pursuant to the vicarious liability principle of ratification. *Id.*

As set forth in greater detail below, the "essential ingredient," for determining whether vicarious liability can be imposed is the "extent of control exercised by the [principal]." *See United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010). The record evidence unequivocally establishes – as a matter of law – that DNF did not control MNS to a degree that would render it vicariously liable for MNS's conduct. Accordingly, this Court should grant DNF's motion in its entirety.

**PROCEDURAL BACKGROUND**

On May 17, 2017, Plaintiff filed a Complaint alleging that MNS and DNF violated the FDCPA. (Dkt. 1). In response to the Complaint, DNF filed a Motion to Dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), arguing that DNF cannot be held vicariously liable for MNS's alleged violations of the FDCPA as DNF does not meet the statutory definition of "debt collector." (Dkt. 13). Thereafter, Plaintiff filed the First Amended Complaint. (Dkt. 16).

On July 24, 2017, DNF moved to dismiss the First Amended Complaint, pursuant to Fed. R. Civ. P. 12(b)(6), on the basis that Plaintiff failed to plausibly allege that DNF is a debt collector under either the "principal purpose" prong or "regularly collects" prong of the FDCPA because it does not does not engage in collection, but rather it contracts with third party debt collectors to conduct all collection related activities. Doc. 18. (Dkt. 18). This Court issued its opinion and order granting DNF's motion to dismiss. (Dkt. 27). Plaintiff then moved for leave to file a Second

Amended Complaint on December 4, 2017. (Dkt. 29). This Court denied Plaintiff's motion for leave and reaffirmed its November 3, 2017 Opinion and Order. (Dkt. 34).

On October 30, 2018, Plaintiff filed an appeal to the Ninth Circuit, challenging, among other things, this Court's determination that DNF did not meet the statutory definition of "debt collector" under the FDCPA. (Dkt. 46). Ultimately, on March 10, 2020, the Ninth Circuit reversed and remanded, finding that DNF was a "debt collector" as defined by the FDCPA. (Dkt. 48). On August 15, 2020, Plaintiff filed the Second Amended Complaint, alleging, *inter alia*, that DNF was vicariously liable for MNS's violations of the FDCPA, pursuant to federal common law agency principles. (Dkt. 55). Thereafter, DNF filed its Answer to Plaintiff's Second Amended Complaint (Dkt. 59).

## FACTUAL BACKGROUND

### I. THE COLLECTION SERVICES AGREEMENT

DNF's involvement in this case stems from its Collection Services Agreement ("CSA") with MNS. *See* Declaration of David Maczka ("Maczka Dec."), Ex. A. Pursuant to the CSA, DNF outsourced its accounts to MNS for collection purposes, which included Plaintiff's accounts. Maczka Dec. at ¶¶ 5-6; *see also* Declaration of Michael Shaw, Sr. ("Shaw Dec."), at ¶ 5. MNS was compensated on a commission basis. Maczka Dec., at Ex. A, ¶ 12; Shaw Dec., at ¶ 6. MNS was acting as an independent contractor of DNF. *Id.* Ex. A, ¶ 23; Shaw Dec., at ¶ 6.

The CSA further provided that MNS was required to comply with all applicable federal and state laws. Maczka Dec., at ¶ 10. Specifically, as it relates to this case, DNF required MNS "to adhere to the Fair Debt Collection Practices Act (15 U.S.C. § 1692 et seq.) and the guidelines established by the Federal Trade Commission." *Id.* at Ex. A, ¶ 1. In addition to complying with all applicable laws, the CSA provided that MNS was to "implement thorough collection

procedures in the attempt to achieve the maximum recovery of debts[,]" including placing a "reasonable number of telephone calls along with a reasonable number of mail efforts." *Id.* at Ex. A, ¶ 2. In sum, the CSA required MNS to abide by the law and implement practices to achieve the maximum recovery of debts. *Id.* at ¶¶ 10-11.

In the CSA, DNF retained the right to audit its accounts placed with MNS. *See* Maczka Dec., Ex. A at ¶ 8; Declaration of Brendan H. Little ("Little Dec."), at Ex B ("Maczka Dep."), 144-145. Specifically, CSA provides that DNF may audit MNS to review MNS's collections efforts, compliance with the CSA and applicable laws and regulations. *Id.*

## II. MNS'S ALLEGED VIOLATIONS OF THE FDCPA

The Second Amended Complaint alleges that on February 24, 2017, Plaintiff received a voice message from an agent or employee of MNS. (Dkt. 55, ¶ 12). The aforementioned message allegedly stated as follows:

> Hello this message is intended for Jillian McDory [sic]. I'm calling in regards to asset verification and to confirm the address and place of employment. I was forwarded documentation at this verified name and Social Security number in regards to a process for enforceable review. Please be advised that we are requesting fees assigned for and respond for required notice so before I go ahead and begin to schedule your document I wanted to inform you the process is being expedited and should commence within 24 to 48 hours from this point in time. Any questions contact an advisor directly at 877-937-0518, reference the file number 51839381.

(Dkt. 55, ¶ 12).

According to the Second Amended Complaint, Plaintiff called the telephone number left on her voicemail and allegedly spoke with an MNS agent named Michael Shaw who implied that he was a lawyer and calling on behalf of DNF. (Dkt. 55, ¶ 16). In a subsequent phone call to Mr. Shaw, Plaintiff gave Mr. Shaw her debit card number and agreed to pay MNS $894.30 on March 4, 2017. (Dkt. 55, ¶ 17). That same day, Plaintiff received an email from MNS containing the

settlement agreement. (Dkt. 55, ¶ 18). Plaintiff alleges that MNS withdrew the funds from her account a day early, on March 3, 2017, and received a Paid in Full Letter from MNS. (Dkt. 55, ¶¶ 21-22).

Based on the above conduct, Plaintiff alleges that MNS violated various provisions of the FDCPA. (Dkt. 55, ¶ 28). Plaintiff asserts that DNF is "vicariously and jointly liable" for MNS's alleged violations of the FDCPA under federal common law agency principles. (Dkt. 55, ¶ 26). Specifically, Plaintiff asserts the following theories of vicarious liability: actual authority, apparent authority, and ratification. (Dkt. 55, ¶ 26). In support of her actual and apparent authority claims, Plaintiff alleges that:

> DNF allowed MNS to represent that MNS was acting as an agent of DNF and DNF knew that MNS would represent to Ms. McAdory that MNS was collecting the debt on behalf of DNF and would use DNF's name. Based upon the representations made by MNS, First Choice Assets, LLC, and Kay Jewelers at DNF's direction or acquiescence and with DNF's knowledge, Ms. McAdory reasonably believed that MNS was acting as DNF's agent when it collected the debt from her and believed that all or most of the money that she paid to MNS would be sent to DNF because DNF owned the debt.

(Dkt. 55, ¶ 26). In support of her ratification claim, Plaintiff alleges that:

> DNF set up the collection structure between itself and MNS to remain willfully ignorant and to avoid liability. *Inter alia*, DNF's directions to MNS to collect DNF's debts in general and to collect the debt from Ms. McAdory specifically, were very general and open-ended. DNF did not set performance or operational standards for MNS, nor did DNF have policies or procedures in place to ensure that MNS's collection and calling practices complied with the FDCPA, nor did DNF have any system or make any efforts to monitor MNS's collection activities when collecting debts on its behalf.

(Dkt. 55, ¶ 26).

Despite these allegations, the record establishes that DNF never communicated with Plaintiff in any form. *See* Little Dec., Ex. A ("McAdory Dep.") at 32:7-10, 38-42; Maczka Dep.,

12:18-22; 41:15-23; 42:17-20. Indeed, Plaintiff could only testify that a MNS representative informed her that he "was M.N.S. Associates collecting on behalf of DNF Associates." McAdory Dep. at 58:3-6. MNS was compelled to and did disclose to Plaintiff that DNF was the current creditor of her account, pursuant to the FDCPA. *See* Shaw Dec., at ¶ 11. MNS, however, never informed or suggested to Plaintiff that DNF controlled, directed, endorsed or authorized MNS's collection efforts. *See* Shaw Dec., at ¶ 12.

When asked for the basis of her lawsuit against DNF, Plaintiff testified:

> DNF hired M.N.S. to collect on a debt that I owed to DNF. And when DNF instructed M.N.S. to collect the money from me, they -- DNF armed M.N.S. with my social security number, my address, other contact information, other relevant information about me. And when the money was collected from me during the process, it was -- my rights were violated. And I don't think DNF should hire people to do illegal things. And M.N.S. and DNF violated my rights.

*See* McAdory Dep. at 18:19-25 – 19:1-11. In follow up, DNF's counsel asked Plaintiff the following question and Plaintiff gave the following answer:

> Q: Is it your position that DNF hired M.N.S. to -- just to collect the debt or they hired them to collect the debt illegally?
>
> A: I don't know what DNF -- what I would say is that, if you give someone -- what I think is that, if you give someone my social security number my contact information, and authorize them and hire them to collect on a debt for you -- because the money was going to DNF -- then I would assume -- or I would think that you were instructed on how to collect that debt.

McAdory Dep. at 22:20-25 - 23:1-5.

As to DNF's involvement in the collection process, Plaintiff testified that DNF provided MNS with her account information, such as her social security number, and every piece of documentation Plaintiff received had "DNF's name" on it. *See* McAdory Dep. at 19:1-6; 22:20-

25; 23:1-5; 24:7-13. However, Plaintiff testified that each letter she received concerning her debt was not sent to her by DNF or she "did not know." *See* McAdory Dep. at 34:19-21; 39-41; 50-51.

Significantly, Plaintiff testified that she did not know if DNF authorized or directed MNS to collect her debt in a "certain manner or fashion." McAdory Dep. at 67:5-15. Plaintiff did not know if DNF told MNS when to call her, how often to call her, or what to communicate to her. McAdory Dep. at 67:17-25- 68:1. Ultimately, Plaintiff, in conclusory fashion, testified that "DNF was apart of the [collection] process. And the collection process was illegal, and it violated my rights." McAdory Dep. at 24:2-6. Plaintiff's testimony is telling in that regard:

> Q: And what are you contending specifically that DNF did wrong?
>
> A: They instructed M.N.S. to collect money from me. They authorized M.N.S., and through that -- the way they authorized it was giving my information.

McAdory Dep. at 19:12-17. In a similar conclusory fashion, Plaintiff testified that DNF controlled MNS's collection practices because they owned her debt and hired MNS to collect it. McAdory Dep. at 68:14-19 ("So DNF controlled and directed the relevant aspects of the collection. They did -- M.N.S. had no reason to contact me if it had not been for DNF. I did not owe M.N.S. any money. I owed DNF the debt…"). As detailed above, Plaintiff could not provide a specific basis for her claim that DNF controlled or directed MNS's conduct toward her.

To the contrary, DNF's Chief Compliance Officer, David Maczka, testified at length that DNF did not control the manners or methods used by MNS. *See* Maczka Dep. at 42:12-20; 51:20-25; 99:4-25; 115:20-24; 128:14-24; Shaw Dec., at ¶¶ 7-8, 12. Nor did DNF supervise MNS in its day-to-day activities or supply MNS with telephones or technology used to collect any accounts, scripts for MNS to use when communicating with consumers, or letter templates to use in the collection of any accounts. *See* Shaw Dec., at ¶ 8.

Additionally, DNF performed an audit of MNS in November of 2016. *See* Maczka Dec., at ¶ 14; Ex. B-H. As part of the audit, DNF reviewed MNS's training policies, collection scripts and letter templates. *Id.* at Ex. B-H. DNF reviewed the test results of MNS's consumer law compliance administer to its collection agents and MNS's litigation matrix listing any lawsuit filed against MNS in the past three months. *Id.*; Shaw Dec., at ¶ 9.

**ARGUMENT**

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings to identify facts that show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

A court must view the evidence in the light most favorable to the nonmoving party. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). All reasonable doubt as to the existence of a genuine dispute of material fact should be resolved against the moving party. *Hector v. Wiens*,

533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

## II. FEDERAL COMMON LAW AGENCY PRINCIPLES AND FDCPA

On remand, Judge Morgan Christen instructed that "the existing body of case law will govern the requirements of vicarious liability, and this opinion does nothing to alter that regime." *McAdory v. M.N.S. & Associates, LLC*, 952 F.3d 1089, 1096 (9th Cir. 2020). However, the existing body of case law in the Ninth Circuit surrounding vicarious liability under the FDCPA is scarce. The jurisprudence begins with *Fox v. Citicorp Credit Serv., Inc.*, 15 F.3d 1507, 1516 (9th Cir. 1994), in which the Ninth Circuit held "[i]n order to give reasonable effect to section 1692i [which requires collection actions to be brought in the proper venue], we must conclude that Congress intended the actions of an attorney to be imputed to the client on whose behalf they are taken." Relying on *Fox*, the Ninth Circuit in *Newman v. Checkrite California, Inc.*, 912 F. Supp. 1354, 1370 (9th Cir. 1995), noted that "it is established that, under the FDCPA, a debt collector may be found vicariously liable for the conduct of its attorney." Since *Fox* and *Newman*, district courts have wrestled with the issue of whether a debt collector or creditor can be liable for their attorneys' violation of the FDCPA. *See e.g. Oei v. N Star Capital Acquisitions, LLC,* 486 F.Supp.2d 1089, 1097 (C.D. Cal. 2006) ("that attorneys are agents of their debt collector clients, and therefore may be held vicariously liable under the FDCPA."); *Huy Thanh Vo v. Nelson & Kennard*, 931 F.Supp.2d 1080, 1090 (E.D. Cal. 2013) (holding a creditor can be liable for its attorney's violations of the FDCPA).

While the law above tracks the progression of vicarious liability in the attorney-debt collector relationship, the law is sparse with regard to a debt buyer-debt collector relationship. The

one clear rule applicable to this case as it relates to vicarious liability under the FDCPA is: "general principles of agency ... form the basis of vicarious liability under the FDCPA." *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1173 (9th Cir. 2006).

The Ninth Circuit relies on the Restatement (Third) of Agency for common law agency principles. *A.B. v. Hilton Worldwide Holdings Inc.*, 2020 WL 5371459, at *1, *10 (D. Or. Sept. 8, 2020). "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01. In other words, an actual agency relationship requires: "(1) a manifestation by the principal that the agent shall act for him; (2) that the agent has accepted the undertaking; and (3) that there is an understanding between the parties that the principal is to be in control of the undertaking." *See id.* (citing *Sun Microsystems, Inc. v. Hynix Semiconductor, Inc.*, 622 F. Supp. 2d 890, 899 (N.D. Cal. 2009) (citing Restatement (Third) of Agency § 1.01 (2006)).

The "bedrock theories of agency" through which a principal can be held liable for the legal consequences of its agent's conduct are: actual authority, apparent authority, ratification, and manners and means theory. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018). As detailed below, the record evidence unequivocally establishes that DNF cannot be held liable under these "bedrock principles of agency."

## III. MNS DID NOT HAVE "ACTUAL AUTHORITY" TO VIOLATE THE FDCPA

"Actual authority arises through the principal's assent that the agent take action on the principal's behalf." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1054 (9th Cir. 2017) (citing Restatement (Third) Of Agency § 3.01 (Am. Law Inst. 2006)). "Actual authority is limited to actions specifically mentioned to be done in a written or oral communication or

consistent with a principal's general statement of what the agent is supposed to do." *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018) (internal quotation marks and citation omitted). To establish liability under actual authority, Plaintiff must demonstrate that MNS had DNF's actual authority to communicate with Plaintiff in violation of the FDCPA. *See Id.* (holding that in order to establish liability under "actual authority," the plaintiffs' must establish the third-party telemarketer had actual authority to make unlawful telephone calls in violation of the TCPA); *see also Armstrong v. Investor's Business Daily, Inc.*, 2020 WL 2041935, at * 7 (C.D. Cal. Mar. 6, 2020) (same).

In *Jones*, the plaintiffs sought to hold the defendant liable for several telephone calls made in violation of the TCPA, placed by a telemarketing company. The plaintiffs advanced several theories of vicarious liability, including that the "telemarketers were [the defendant's] agents acting within their actual authority in placing the unlawful calls." *Jones*, 887 F.3d at 449. The district court granted summary judgment in favor of the defendant and the Ninth Circuit affirmed. *Id*. at 446. For purposes of the actual authority analysis, the Ninth Circuit assumed that the telemarketers were the defendant's agent, and only examined whether the plaintiffs identified evidence that could sustain a jury's finding of actual authority. *Id.* at 449. The court held that the plaintiffs failed to identify any such evidence. *Id.*

In doing so, the court noted the agreement between the parties indisputably and expressly "prohibited any act or omission that violates applicable state or Federal law, including but not limited to robo-calling." *Id.* (internal quotations omitted). The plaintiffs identified no record evidence contradicting this limitation on the telemarketers' authority, and as a result, the Ninth Circuit rejected the actual authority theory. *Id.*; *see also Armstrong*, 2020 WL 2041935, at * 7 ("Because Plaintiff has failed to identify any record establishing Handstack's actual authority to

send the text messages to Plaintiff in violation of the TCPA, the Court determines that Plaintiff cannot base its claim on actual authority.").

Here, the CSA expressly provides that MNS "shall be in full compliance with all state, federal, and local laws and regulations." *See* Maczka Dec. at Ex. A, ¶ 10. Specifically, the CSA prohibits MNS from using "any threats, intimidation or harassment of debtor in the collection of accounts or violate any guidelines established by the Federal Trade Commission, or any other applicable laws, rules, or regulations." *Id.* at Ex. A, ¶ 1. More significantly, the CSA provides that MNS "agrees to adhere to the Fair Debt Collection Practices Act[.]" *Id.* Nor is there any record evidence that contradicts the plain terms of the CSA that required MNS to lawfully collect Plaintiff's debt. Indeed, Mr. Maczka's testimony establishes that DNF expected MNS complied with the FDCPA when servicing DNF's accounts. Maczka Dep., at 90:11-15.

Thus, the record evidence unequivocally establishes that MNS had no actual authority to collect Plaintiff's debt in violation of the FDCPA. Therefore, as a matter of law, Plaintiff cannot establish that DNF is liable under the actual authority theory.

## IV. DNF DID NOT CONTROL THE MANNER AND MEANS OF MNS'S COLLECTION PRACTICES

Plaintiff also cannot prevail on the "manner and means" theory of vicarious liability set forth in *Jones*, *supra*. In *Jones*, the plaintiffs asserted that the defendant had sufficient authority to control the "manner and means" of the telemarketer's activity to be found vicarious liable for the telemarketer's violations of the TCPA. *Jone*s, 877 F.3d at 446. The court noted that, in determining whether vicarious liability may be imposed, the "extent of control exercised by the [principal]" is the "essential ingredient." *Id.* (citing *United States v. Bonds*, 608 F.3d 495, 505 (9th Cir. 2010)). Accordingly, the Ninth Circuit adopted the following ten factors to determine if a "principal has enough authority to control the actions of its agents" to be held vicarious liable:

> 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer supplies tools and instrumentalities [and the place of work], 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business.

*Id.* at 450. Applying this ten-factor test to the instant case, the record unequivocally weighs in favor of a finding that DNF did not exercise the requisite level of control over MNS to be held liable under the "manner and means" theory.

***i. The Control Factor***

First, the record evidence establishes that DNF only exercised a limited degree of control which is insufficient to establish vicarious liability. *Jones*, 887 F.3d at 451 (holding a principal's "limited control" over its agent is insufficient to establish the control factor). DNF's limited control over MNS was primarily related to results MNS's services, rather than the means and methods MNS used to obtain the results. In this regard, the CSA provides that MNS agrees to "implement through collection procedures in the attempt *to achieve maximum recovery of debts*." Maczka Dec., at Ex. A ¶ 2 (emphasis added). Additionally, the CSA provides that minimum settlement amount DNF would accept from its debtors. *Id.*, at Ex. A ¶ 20. The above exemplifies DNF's control over the results of MNS' services, not the methods used to collect on DNF's accounts. *See Fenton v. Freedman*, 748 F.2d 1358, 1362 (9th Cir. 1984) ("Conversely, if control may be exercised only as to the result of the services performed and not the means and methods by which it is accomplished, then the provider is an independent contractor, and not an agent.").

Furthermore, Mr. Maczka's testimony establishes that the only control DNF exerted over the manner and means MNS used to service its accounts was to abide by all applicable laws and

regulations. Maczka Dep., at 90:11-15; 100:8-9; *see also*, Maczka Dec., at Ex. A ¶ 1. DNF, however, did not control the hours MNS worked, supervise MNS' day-to-day operations, or set quotas for the amount of telephone calls MNS needed to place to debtors. *See* Maczka Dep., at 99:8-10 ("We don't have control over MNS. We don't direct them to do anything, expect here's accounts and collect on them."); Shaw Dec, at ¶¶ 7-12.

Although the CSA required MNS to place "a reasonable number of telephone calls along with a reasonable number of mail efforts[,]" (Maczka Dec., at Ex. A, ¶ 2) this alone does not establish the requisite level of control to hold DNF vicariously liable. *See Jones*, 887 F.3d at 451 (finding defendant had "only limited control" over telemarketer where defendant required telemarketer to abide by all applicable federal law, to keep records, give defendant weekly reports, collect payments on behalf of defendant, and obtain defendant's approval before using sales materials, but defendant did not "have the right to control the hours the [alleged agent] worked," or to "set quotas for the number of calls or sales the [alleged agent] had to make"); *Knapp v. Sage Payment Sols., Inc*., 2018 WL 659016, at *3 (N.D. Cal. Feb. 1, 2018) (finding that the defendant exercised "limited control" where it similarly did not set quotas for the number or amount of sales for the telemarketers, control the hours they worked, or supervised the telemarketers in the course of its day-to-day activities).

Accordingly, the first – and most important – factor weighs against a finding of agency. *See Bonds*, 608 F.3d at 505.

***ii. The Distinct Occupation Factor***

The second factor also weighs in favor DNF. *See Armstrong v. Investor's Business Daily, Inc.*, 2020 WL 2041935, at * 7 (C.D. Cal. Mar. 6, 2020) ("[alleged agent] is an independent business engaged in marketing services, and therefore, weighs against an inference of this theory

of agency."). Here, DNF is as distinct businesses from MNS: DNF was Plaintiff's creditor and MNS attempted to collect Plaintiff's debt owed to DNF. Moreover, DNF did not use MNS as its exclusive debt collector and MNS collects debt for other entities. *See* Maczka Dep., at 172: 21-24; Shaw Dec., at ¶ 3. *Jones*, 887 F.3d at 452 (finding the fact that the telemarketer had many different clients and offered the same services during that period question weigh against a finding of agency). Accordingly, the second factor weighs against a finding of agency.

***iii. The Supervision Factor***

The third factor weighs in favor of DNF. *See Jones*, 887 F.3d at 452 (finding the third factor favored a finding against vicarious liability where defendant "provided some training and oversight at call center" and defendant's president visited call center "about a dozen times" but defendant did not "directly supervise" the telemarketer's calls); *Armstrong*, 2020 WL 2041935, at * 9 ("As to the third factor, there is no evidence that IBD supervised any Handstack employees while the texts were sent. Although IBD reviewed the content of the text messages, IBD appears to have had limited interaction and no supervision of the employees."). Here, DNF did not supervise MNS's the day-to-day operations or actively train MNS's collection agents. *See* Shaw Dec., ¶¶ 7-9; Maczka Dep. 116-117. Accordingly, the third factor weighs against a finding of agency.

***iv. The Skill Factor***

As to the fourth factor, the record does not contain any evidence concerning the skill required to place telephone calls in an attempt to collect a debt. Therefore, this factor should not be considered. *See Jones*, 887 F.3d 452 ("As to the fourth factor, the record does not contain any evidence regarding the skill required to place the calls or sell a VSC. Therefore, we do not consider this factor in our analysis.").

***v. Tools and Instrumentalities Factor***

The fifth factor weighs in favor of DNF. *See Jones*, 866 F.3d at 1107 (finding fifth factor weighed against a finding of agency where the defendant provided "some tools and instrumentalities necessary" for alleged agent to perform services, but alleged agent "suppli[ed] most of the tools and instrumentalities"); *Knapp*, 2018 WL 659016, at *4 ("As to the fifth factor, the evidence, again undisputed, shows [the defendant] did not provide [the alleged agent] with tools, instrumentalities, or a place of work."). Here, DNF did not provide MNS with telephone lines, computers, office space, or any other tools MNS used in connection with its efforts to service DNF's account. *See* Shaw Dec., at ¶ 8. Accordingly, the fifth factor weighs against a finding of agency.

***vi. Length of Time Employed Factor*.**

Admittedly, the sixth factor weighs in favor of a finding of agency. *See Jones*, 887 F.3d at 452 (citing *NLRB v. United Ins. Co. of Am*., 390 U.S. 254, 258 (1968) (finding relevant that individuals had "a permanent working arrangement with the company under which they may continue as long as their performance is satisfactory"). Here, the CSA provides that either party may terminate the contract at any time. Maczka Dec., at Ex. A, ¶ 28. Accordingly, the sixth factor weighs in favor of agency.

***vii. The Compensation Factor***

The seventh factor significantly weighs in favor of DNF. *See Jones*, 887 F.3d at 452 (describing commission based compensation as "strong indicator" that a principal lacks sufficient authority to control its agent); *Armstrong*, 2020 WL 2041935, at *9 (finding same). Here, the CSA indicates that MNS was compensated on a commission basis, rather than for the time MNS worked

on DNF's accounts. Maczka Dec., Ex. A ¶¶ 9, 20; Shaw Dec., at ¶ 6. Accordingly, the seventh factor weighs against a finding of agency.

***viii. The Regular Business of the Employer Factor***

The eighth factor (whether the services performed were part of the regular business of the employer) weighs in favor of DNF. In this regard, although DNF is in the debt collection industry, it does not perform the functions of a debt collection agency, such as communicate with consumers. Maczka Dec., at ¶ 3. *Compare Jones*, 887 F.3d at 453 (holding that although the defendant contracted with many telemarketer's to sell its product, the defendant also was in the business of selling its own product); *Armstrong*, 2020 WL 2041935, at * 9 (holing the eighth factor to be "neutral" where defendant entered into an order form with [the telemarketer] directly and appears to be in the business of selling the subscription service, but where there was no evidence to suggest the defendant regularly sent text messages to potential subscribers).

Accordingly, the eight factor weighs against a finding of agency.

***ix. Subjective Intent of the Parties Factor***

The ninth factor weighs in favor of DNF. *See Knapp*, 2018 WL 659016, at * 5 (finding the parties' agreement stating "[t]he relationship of the parties hereto is that of independent parties contracting for services, and none other[]" weighed against a finding of agency.) Here, The CSA expressly provides that MNS "shall at all times be an independent contractor" and "[n]othing in the [CSA] shall be considered to create a relationship of employer and employee between" DNF and MNS. Maczka Dec., at Ex. A ¶ 23; Shaw Dec., at ¶ 6. Accordingly, the ninth factor weighs against a finding of agency.

***x. The Business Factor***

The tenth factor weighs against DNF as there is no dispute that DNF is a business. *See Jones*, 887 F.3d 453; *Armstrong*, 2020 WL 2041935, at *9 ("As to the tenth and final factor, IBD is a business, which tends to suggest a greater level of control.").

As set forth above, all but two of the factors weigh against a finding of agency. *Jones*, 887 F.3d 453 (finding no vicariously liable under an manner and means theory where the telemarketer was its own independent business, provided its own equipment was compensated on a commission basis, and worked without the direct supervision of [the defendant]; *Armstrong*, 2020 WL 2041935, at * 9 (finding no vicariously liable under an manner and means theory where the telemarketer was its own independent business, provided its own equipment, was compensated on a flat fee , and worked without the direct supervision of [the defendant].). Therefore, the record establishes that DNF did not control the "manner and means" of MNS's collection business to the degree required to render it vicariously liable.

**V. MNS DID NOT HAVE THE "APPARENT AUTHORITY" TO VIOLATE THE FDCPA**

Plaintiff's Second Amended Complaint also asserts that DNF is vicariously liable under the theory of "apparent authority." (Dkt. 55, ¶ 26). "Apparent authority ... is created by a person's manifestation that another has authority to act with legal consequences for the person who makes the manifestation, when a third party reasonably believes the actor to be authorized and the belief is traceable to the manifestation." *Avakina v. Chandler Apts., LLC*, 2015 WL 413813, at *5 (D. Or. Jan. 30, 2015). In other words, "[a]pparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has *authorized the alleged agent to do the act in question.*" *N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity*, 124 F.3d 1094, 1099 (9th Cir. 1997) (emphasis added). Apparent

authority "cannot be established merely by showing that [the alleged agent] claimed authority or purported to exercise it, but must be established by proof of something said or done by the [alleged principal] on which [the plaintiff] reasonably relied." *Armstrong*, 2020 WL 2041935, at * 10 (citing *N.L.R.B.*, 124 F.3d at 1099); *see also Pascal v. Agentra, LLC*, 2019 WL 5212961, at *1, *4 (N.D. Cal. Oct. 16, 2019) (same).

Here, the recorded establishes that DNF never directly communicated with Plaintiff at any point in time. *See* McAdory Dep., at 32:7-10, 38-42; Maczka Dep., 12:18-22; 41:15-23; 42:17-20. Notably, the voicemail referenced in the Second Amended Complaint makes no reference to DNF. (Dkt. 55, at ¶ 12). Nor does the Paid in Full letter that MNS sent to Plaintiff reference or indicate that MNS was settling the debt on behalf of DNF. (Dkt. 55-4). Accordingly, it appears that Plaintiff's "apparent authority" claim stems entirely from MNS's alleged representation to her that it was acting on behalf of DNF – not anything done or said by DNF on which Plaintiff reasonably relied. *See* McAdory Dep. 19:1-6; 22:20-25; 23:1-5; 24:7-13.

Despite these allegations, MNS never communicated or otherwise indicated to Plaintiff that it was conducting itself in a manner authorized or directed by DNF. *See* Shaw Dec., at ¶ 12. Instead, MNS disclosed to Plaintiff the amount of her debt and that DNF was her current creditor, as required by law. *See* 15 U.S.C. § 1692g(a). Indeed, the sole reason DNF's name appeared on MNS's letters to Plaintiff was to comply with the FDCPA – not because DNF directed MNS to do so. Maczka Dep., at 68:6-25; Shaw Dec., at ¶ 12. Plaintiff cannot establish "apparent authority by showing that MNS claimed authority or purported to exercise it." *Pascal* 2019 WL 5212961, at *4. Simply put, the record establishes that DNF never manifested to Plaintiff that MNS had the authority to collect the subject debt in the manner in which it did.

Nevertheless, even if there were evidence to support Plaintiff's contention that DNF manifested MNS had authority to collect the subject debt, there is not a scintilla of evidence which supports a reasonable basis for Plaintiff to believe that DNF authorized the MNS to violate the FDCPA. Plaintiff's subject interpretation of MNS's representation that it was collecting a debt on behalf of DNF is unreasonable insofar as Plaintiff conflates 'collecting of behalf of DNF' with 'collecting of behalf of DNF in violation of the FDCPA. Under Plaintiff's theory, every creditor would be vicariously liable for every act of its debt collectors simply because the creditor contracted with a debt collector to service its accounts. *See McAdory*, 952 F.3d 1096 ("Nor do we suggest that one businessperson may be liable for another just because they are in the same business.").

Thus, in light of the forgoing, Plaintiff's claim for vicarious liability under the "apparent authority" theory fails as a matter law.

## VI. DNF DID NOT RATIFY MNS'S UNLAWFUL CONDUCT

Ratification is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1014 (9th Cir. 2018) (quoting Restatement (Third) of Agency § 4.01(1)). A party "may ratify an act by failing to object to it or to repudiate it," *id*. at § 4.01 cmt. f., or by "receiving or retaining [the] benefits it generates," *id*. at § 4.01 cmt. g. Importantly, even if a principal ratifies an agent's act, "[t]he principal is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking." *Kristensen*, 879 F.3d at 1014. Accordingly, to be liable under a ratification theory, "the principal must either (1) have actual knowledge of all material facts about the agent's act or (2) should have known of the actual facts because a

reasonable person under the circumstances would have investigated further." *Kristensen v. Credit Payment Servs. Inc.*, 2015 WL 4477425, at *1, *3 (D. Nev. July 20, 2015), *affirmed by* 879 F.3d 1010.

***i. Actual Knowledge***

Plaintiff alleges DNF continued to "accept the benefits of MNS's violations of the FDCPA despite knowing of facts about MNS's collection practices." (Dkt. 55, ¶ 26). To prove knowing acceptance, there must be "an objectively or externally observable indication ... that the principal has exercised choice and has consented" to the acts of the purported agent. *See Rodgers v. Postmates*, 2020 WL 3869191, at *1, *7 (N.D. Cal. Jul. 9, 2020), *appeal pending*, (citing Restatement (Third) of Agency § 4.01 cmt. d.).

Here, there is no "objective" or "externally" observable indication that DNF consented to MNS's unlawful conduct. First, the record clearly establishes that DNF required MNS to abide by all applicable laws and regulations, including the FDCPA. Maczka Dec., at Ex. A ¶ 1. *See Jones v. All American Auto Protection, Inc.*, 2015 WL 7566685, at *1, *5 (D. Nev. Nov. 24, 2015), affirmed by 887 F.3d 443, (finding no ratification where the plaintiff submitted no evidence that the defendant "knew or should have known" the telemarketer violated the TCPA, and the contract between the parties required the telemarketer comply with all federal laws).

Second, there is no evidence to support a finding that DNF knew MNS violated the FDCPA in collecting Plaintiff's debt until DNF was sued in this lawsuit. *See* Maczka Dec., at ¶ 10. *Johansen v. HomeAdvisor, Inc.*, 218 F. Supp. 3d 557, 588 (S.D. Ohio 2016) ("Where, as here, a seller has no information of telephone calls being placed by ... [a purported agent], the seller could not have ratified those calls.") (internal citations and quotations omitted); *Makaron v. GE Sec. Mfg., Inc.*, 2015 WL 3526253, at *1, *10 (C.D. Cal. 2015) ("Indeed, as already noted above,

UTCFSA has no information of telephone calls being placed by or on behalf of SOAS and, hence, could not have ratified those calls.”).

Simply put, DNF cannot ratify an act, based on actual knowledge, if it had no knowledge of the act in question. *See Kristensen*, 879 F.3d at 1015 (“Although AC Referral was an agent of Click Media, Kristensen presented no evidence that Click Media had actual knowledge that AC Referral was sending text messages in violation of TCPA.”); *Jones*, 2015 WL 7566685 at * 5 (finding the plaintiff provided no evidence that the defendant knew that the telemarketer was violating the TCPA, especially in light of the fact that the parties agree required the telemarketer to comply with all state and federal laws). DNF expected MNS to comply with the FDCPA when attempting to collect Plaintiff’s subject debt and there no evidence indicating that DNF was aware of MNS’s alleged conduct until DNF was sued in this lawsuit. As a result, the record evidence establishes that DNF did not know MNS procured a settlement payment from Plaintiff using that violated the FDCPA. Therefore, Plaintiff cannot prove that DNF ratified MNS’s conduct pursuant the “actual knowledge” ratification theory.

***ii. Willful ignorance***

Plaintiff also alleges that DNF ratified MNS’s unlawful conduct under the theory of “willful ignorance.” (Dkt. 55, ¶ 26). In support of this theory, Plaintiff alleges that:

- DNF’s knowledge of MNS’s collection practices coupled with its “general understanding of the debt collection industry” would have lead a “reasonable person to investigate further.” (Dkt. 55, ¶ 26);
- DNF set up a “collection structure between itself and MNS to remain willfully ignorant to avoid liability.” (Dkt. 55, ¶ 26); and

- DNF did not have "policies and procedures in place to ensure that MNS's collection and calling practices complied with the FDCPA" or make any efforts to monitor MNS's collection activities on DNF's behalf. (Dkt. 55, ¶ 26).

As detailed below, the record establishes these theories of ratification fail as a matter of law.

A principal that is "willfully ignorant" might not know the material facts, but ratifies "with awareness that such knowledge was lacking." *See* Restatement (Third) of Agency § 4.01 cmt. b. The Restatement makes clear that a principal must be alerted to some sort of "red flag" or "suspicious fact before it will be charged with constructive knowledge of an agent's acts." *Kristensen*, 2015 WL 4477425, at *3.

The Restatement provides an example of a ratification under this "should have known" standard, involving a manufacturer who receives a letter from a purchaser. In *Kristensen*, the court summarized this example as follows:

> The purchaser writes: "We have, as you know, recently increased our order because of the impressive assurances made by [your agent] about your new return policy and improved product quality." The manufacturer, who has not made any sort of policy change, fears that his agent made false statements to the purchaser. But the manufacturer does not ask either the agent or purchaser what statements were made. This is a valid ratification because the manufacturer was willfully blind to an obvious red flag about its agent's communications to the purchaser.

*Id.* (internal citations omitted).

Applying these principles, the court in *Kristensen* found that the defendant did not ratify its telemarketer's violations of the TCPA. *Id.* at *3. Specifically, under the "should have known standard," the court held ratification "requires the [defendants] to at least know of a red flag that would put them on notice of [telemarketer's] unsolicited texting campaign." *Id.* The court determined that the defendants' general suspicion of the telemarketer's activity was not a "red flag." *Id.* at *4. Instead, the "plaintiffs' theory of ratification is that defendants consciously

remained ignorant of [the telemarketer's] illicit texting practices." *Id.* However, "to be consciously ignorant a defendant must fail to investigate after becoming aware of specific reasons to be suspicious." *Id.* Ultimately, the court rejected the plaintiffs' "theory that defendants are strictly liable anytime they do not affirmatively seek out additional facts about a marketer" because it would read the vicarious liability analysis out of the TCPA. *Id.* Thus, the court held the defendants' did not ratify the telemarketer's violations of the TCPA as there were no "red flags" which should have led the defendants' to investigate the telemarketer's practices. *Id.*

Here, the record devoid of any "red flags" that support a finding that DNF remained "consciously ignorant" to MNS's unlawful conduct toward MNS. Nor is there any allegation in the Second Amended Complaint or evidence in the record that DNF knew of any "red flags" as it related to MNS's conduct toward Plaintiff, such as knowledge of other lawsuits filed against MNS for violations of the FDCPA. *See Abante Rooter & Plumbing, Inc. v. Arashi Mahalo, LLC, ,* 2019 WL 6907077, at *1 (N.D. Cal. Dec. 19, 2019) (holding that the plaintiff failed to establish ratification because there was no evidence in the record that the defendant "remained willfully ignorant of any 'red flag' indicating [the independent contractor's] unlawful methods" when it called customers in violation of the TCPA); *Johansen*, 218 F. Supp. 3d at 588 (holding that the plaintiff failed to allege sufficient "red flags" to support a ratification claim, noting there were no allegations or evidence of where previous lawsuits against the defendant were filed, which third-party telemarketers were at issue in those cases, or what remedial steps the defendant took or failed to take as a result of those legal actions.).

Nonetheless, Plaintiff alleges that DNF's "willful ignorance" ratified MNS's conduct because DNF did not implement, among other things, any "system or make efforts to monitor MNS's collection actives when collecting debts on its behalf." (Dkt. 55, ¶ 26). The record

irrefutably contradicts this allegation. DNF conducted an audit of MNS to review MNS's compliance with the CSA. Maczka Dep., at 145:5-16; Maczka Dec., at ¶ 8. As part of the audit, DNF reviewed the following information concerning MNS's collection practices:

- MNS's "Paid In Full Letter" template;
- MNS's "Settlement Letter" template;
- MNS's Training Guidelines;
- MNS's Script Guidelines for conversations with consumers;
- MNS's performance reviews of its collection agents;
- The results from MNS's collection agent consumer law compliance test;
- MNS's ligation matrix for lawsuits filed against it within three month of DNF's audit.

*See* Maczka Dec. at Ex. B-H. In light of the audit, DNF did not "stick its head in the sand" or "fall asleep at the wheel" with respect to monitoring MNS conduct. To the contrary, DNF took steps to ensure that MNS was complying with the FDCPA. Therefore, Plaintiff cannot prevail on a "willful ignorance" theory of ratification. *See Jones*, 2015 WL 7566685, at * 5 ("[The defendant] also made efforts to enforce compliance, and they investigated [the telemarketer] when they suspected wrongdoing. Plaintiffs, therefore, fail to allege a plausible basis to hold [the defendant] liable under a ratification theory.").

This leaves Plaintiff with her theory that DNF's general knowledge of the "debt collection industry" should have lead it to further investigate MNS. (Dkt. 55, ¶ 26). A similar theory was rejected by the court in *Kristensen* that held the defendants did not ratify the conduct of the telemarketing agency that violated the TCPA. *Kristensen*, 2015 WL 4477425, at *3. There, the court found that plaintiffs mere reliance "on the [the defendant's] general knowledge that lead-

generators use texting in this industry" was insufficient to establish ratification. *Id.*; *see also Armstrong*, 2020 WL 2041935, at * 12 ("Plaintiff has failed to identify any cases stating that a defendant could be held liable for a third-party's violation of TCPA under the non-delegation doctrine. In fact, a wealth of cases suggests otherwise and find that a defendant is not liable unless it willfully ignores red flags."). Accordingly, DNF's general understanding of the debt collection industry has no bearing on whether is ratified MNS's unlawful conduct.

Lastly, although Plaintiff does not expressly allege that DNF knew of pending or past FDCPA lawsuits against MNS, her Second Amended Complaint asserts that DNF continued to accept the benefits of MNS's violations of the FDCPA. (Dkt. 55, ¶ 26). However, the record establishes that DNF did not exercise this alleged acquiescence. To the contrary, DNF's audit included its review of MNS's recent litigation history. *See* Maczka Dec., at Ex. H. Pursuant to that review, DNF was not aware of any lawsuits filed against MNS. *See id.* Therefore, DNF did not remain "willfully ignorant" to MNS's collection activities. *See Armstrong*, 2020 WL 2041935, at *12 ("Plaintiff has not cited a single case, where a defendant was held to have ratified a third party's unlawful act because there was a pending lawsuit against the third party, of which the defendant was unaware.").

In sum, Plaintiff cannot prevail on her "willfully ignorant" ratification theory as a matter of law. The record unequivocally establishes that that DNF was not aware of any "red flags" sufficient to warrant further investigation into MNS's servicing of Plaintiff's account; took steps to ensure that MNS was complying with all applicable laws and regulations; and was not aware of any pending litigation against MNS for violations of the FDCPA. Therefore, this Court should grant DNF's summary judgment motion with respect to Plaintiff's ratification claim.

**CONCLUSION**

For the reasons set forth above, this Court should grant DNF's motion for summary judgment, dismissing the Plaintiff's Second Amended Complaint in its entirety.

DATED: January 29, 2021

**LIPPES MATHIAS WEXLER FRIEDMAN LLP**

/s Brendan H. Little
Brendan H. Little, Esq.
*Admitted Pro Hac Vice*
Attorneys for Defendant
DNF Associates, LLC
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
P: 716-853-5100
F: 716-853-5199
Email: blittle@lippes.com

THE LAW OFFICE OF JORDAN MICHAEL NEW

Jordan M. New, Esq.
Attorneys for Defendant
DNF Associates, LLC
1001 SW 5th Avenue
Suite 1100, #483
Portland, Oregon 97204
P: 503-919-0027
Email: jordan@newlawpdx.com

**CERTIFICATE OF COMPLIANCE**

This brief complies with the applicable word-count limitation under LR 7-2(b), 26-3(b), 54-1(c), or 54-3(e) because it contains 8,393 words, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s Brendan H. Little
Brendan H. Little, Esq.

**CERTIFICATE OF SERVICE**

I hereby certify that on January 29, 2021 I electronically filed the foregoing motion with the Clerk of the Court via the CM/ECF system, which will provide service to counsel for all parties.

/s Brendan H. Little
Brendan H. Little, Esq.