IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JILLIAN McADORY,

              Plaintiff,

   v.

M.N.S. & ASSOCIATES, LLC, and
DNF ASSOCIATES, LLC, foreign
limited liability companies,

              Defendants.

No. 3:17-cv-00777-HZ

OPINION & ORDER

Kelly D. Jones
Law Office of Kelly D. Jones
819 SE Morrison St., Suite 255
Portland, OR 97214

Kevin A. Mehrens
Law Office of Kevin A. Mehrens
319 SW Washington St., Suite 614
Portland, OR 97204

      Attorneys for Plaintiff

1 – OPINION & ORDER

Jordan M. New
Law Office of Jordan Michael New
1001 SW 5th Ave., Suite 1100, #483
Portland, OR 97204

Brendan H. Little
Lippes Mathias Wexler Friedman LLP
50 Fountain Plaza, Suite 1700
Buffalo, NY 14202

      Attorneys for Defendants

HERNÁNDEZ, District Judge:

      Plaintiff Jillian McAdory brings this action alleging violations of the Fair Debt Collection Practices Act ("FDCPA" or "Act"), 15 U.S.C. § 1692 et seq., against Defendants M.N.S. & Associates, LLC ("MNS"), and DNF Associates, LLC ("DNF"). Currently before the Court are Plaintiff's and DNF's motions for summary judgment. For the following reasons, the Court grants Plaintiff's Motion for Partial Summary Judgment and denies DNF's Motion for Summary Judgment.

## BACKGROUND

      In December 2015, Plaintiff obtained a line of credit from Kay Jewelers to purchase jewelry for personal use. Jones Decl. Ex. 1 at 2-8, ECF 72-1; McAdory Decl. ¶ 2, ECF 73; Jones Decl. Ex. 2 ("McAdory Dep.") at 31:15-20, ECF 72-2. Plaintiff could not afford to pay back the loan, and in fall 2016, Kay Jewelers "charged off" the debt and sold it to DNF. McAdory Decl. ¶¶ 4-5, Ex. B, ECF 73-2.

      In late November 2016, Plaintiff received a letter from a debt collector named First Choice Assets, LLC ("First Choice") that stated DNF was the current creditor of her debt, listed Kay Jewelers as the original creditor, referenced her account number and file number, and requested that Plaintiff pay her balance of $2,235.77. *Id* at Ex. C, ECF 73-3. Plaintiff could not

afford to pay back her debt when she received the letter and, therefore, First Choice was unsuccessful in collecting the debt for DNF. *Id.* at ¶ 7.

In February 2017, DNF outsourced 460 outstanding debts to MNS for collection, including Plaintiff's account. Jones Decl. Ex. 3 at 2, 4, ECF 72-3; Jones Decl. Ex. 4 ("Maczka Dep.") at 35:18-22, 168:23-169:13, ECF 72-4. In total, DNF assigned MNS approximately 13,304 accounts for collection between May 1, 2016 and May 1, 2017. Jones Decl. Ex. 5 ("DNF Resp. Interrog.") at ¶ 8, ECF 72-5. MNS's debt collection activities are governed by a Collection Services Agreement ("CSA") that DNF and MNS's predecessor entity, MSW Associates, LLC, executed in August 2014. Maczka Decl. Ex. A ("CSA"), ECF 69-1; Shaw Decl. ¶ 4, ECF 70. The CSA characterized MNS as an independent contractor of DNF to be compensated on a commission basis. CSA ¶¶ 13, 23. The CSA provided that MNS must comply with all applicable federal and state laws in its collection efforts, including the FDCPA and guidelines established by the Federal Trade Commission. *Id.* at ¶ 1.

The CSA further required MNS to "implement thorough collection procedures in the attempt to achieve maximum recovery of debts[,]" including "a reasonable number of telephone calls along with a reasonable number of mail efforts," and "[s]kiptracing procedures . . . wherever necessary." *Id.* at ¶ 2. DNF retained the right to "audit its accounts placed with [MNS] at any time," including, "but not limited to, a review of collection efforts, adequacy of cash controls, compliance with [the CSA], compliance with applicable regulations and statutes, and any other normal auditing procedures." *Id.* at ¶ 11. DNF also reserved the right to "recall any account that has been placed with [MNS], including accounts that have been forwarded for legal action, through verbal or written request, at any time." *Id.* at ¶ 18.

In October and November 2016, DNF conducted an audit of MNS to review its training policies, collection scripts, and letter templates. Maczka Decl. ¶ 8, ECF 69. DNF concluded that the overall quality of calls made by MNS was "significantly disappointing" and that "all calls had a poor tone and general sense of disconnect." Jones Decl. Ex. 13 ("DNF Audit") at 1, ECF 72-12. DNF also found "[t]he prelegal talk . . . being used is aggressive and will need to be reviewed[,]" and that "[t]here is much room for improvement with consumer experience and compliance [and] [s]imple guidelines are not being followed." *Id.*

On February 24, 2017, Plaintiff received a voicemail message from MNS. McAdory Decl. ¶¶ 8-9, Ex. D at 1, ECF 73-4; Jones Decl. Ex. 9. Within an hour of hearing the voicemail, Plaintiff called the number left in the message and spoke to an MNS employee named Michael Shaw. McAdory Decl. ¶ 11, Ex. D at 1. Shaw asked Plaintiff if she was aware that DNF had purchased her debt from Kay Jewelers and informed her that MNS was collecting the debt on behalf of DNF. McAdory Decl. ¶ 11; McAdory Dep. at 20:12-20, 26:18-20, 43:9-11. Shaw offered to settle the debt for $894.30, and about an hour later Plaintiff called him back and agreed to pay the sum. McAdory Decl. ¶ 12. Plaintiff signed a settlement agreement and authorized MNS to debit her bank account on March 4, 2017, but contrary to this agreement, MNS debited her account a day early on March 3, 2017. McAdory Decl. Ex. E at 1-2, ECF 73-5; McAdory Decl. Ex. F, ECF 73-6. Consistent with the CSA, MNS remitted $626.01 (70%) and retained $268.29 (30%) of the $894.30 that it collected from Plaintiff. Jones Decl. Ex. 10, ECF 72-9; Maczka Dep. 169:22-171:15.

Plaintiff filed this action on May 17, 2017, alleging MNS's debt collection activities violated multiple provisions of the FDCPA and that DNF is vicariously liable for MNS's

unlawful conduct. Compl., ECF 1. On July 14, 2017, Plaintiff filed her First Amended Complaint ("FAC"), ECF 16, which DNF moved to dismiss on July 24, 2017. Mot. Dismiss, ECF 18.

On November 3, 2017, the Court granted DNF's Motion to Dismiss, finding the FAC failed to state a claim against DNF because, as a debt purchaser that outsources its debt collection activities to third parties and never interacts with consumers, DNF was not a "debt collector" that could be held liable under the FDCPA. Op. & Order, ECF 27.

MNS elected not to defend itself in this action, and on May 31, 2018, the Court entered an Order of Default against MNS. Order, ECF 39. On October 30, 2018, Plaintiff appealed the Court's dismissal of her claim against DNF. Notice of Appeal, ECF 46.

On March 9, 2020, the Ninth Circuit reversed and remanded the Court's dismissal, holding DNF did not need to directly interact with debtors to qualify as a "debt collector" under the "principal purpose" prong of the FDCPA and could, therefore, be found vicariously liable for MNS's violations of the Act under agency principles. *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1090, 1097 (9th Cir.), *cert. denied sub nom. DNF Assocs., LLC v. McAdory*, 141 S. Ct. 627 (2020).

On September 15, 2020, Plaintiff filed her Second Amended Complaint ("SAC") to allege that DNF is vicariously liable for MNS's conduct under federal common law principles of agency. SAC, ECF 55. On January 29, 2021, DNF and Plaintiff filed their respective motions for summary judgment, which the Court took under advisement on March 9, 2021. ECF 67, 71, 81.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and

identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

To establish MNS is directly liable under the FDCPA, Plaintiff must show: (1) she is a consumer; (2) the debt arises out of a transaction she entered into for personal purposes; (3) MNS is a "debt collector" under the FDCPA; and (4) MNS violated a provision of the FDCPA. *Freeman v. ABC Legal Servs. Inc.*, 827 F. Supp. 2d 1065, 1071 (N.D. Cal. 2011) (citation omitted). To establish DNF is vicariously liable for MNS's violations of the Act, Plaintiff must

demonstrate: (1) DNF is also a "debt collector," and (2) MNS was acting as DNF's agent and within the scope of its agency when it violated the FDCPA. *McAdory*, 952 F.3d at 1097; *Restatement (Third) of Agency* §§ 7.04, 7.08 (2006).

As a preliminary matter, there are no material disputes as to most of the elements Plaintiff must prove to prevail on her claims. Plaintiff is a consumer whose original debt with Kay Jewelers arose out of a transaction that she entered into for personal purposes. McAdory Decl. ¶ 2; 15 U.S.C. § 1692a(3), (5). Further, MNS is a "debt collector" within the meaning of the FDCPA because it "regularly collects . . . debts owed or due . . . another." 15 U.S.C. § 1692a(6); *see also* DNF Resp. Interrog. ¶ 8 ("DNF placed approximately 13,304 accounts with MNS for collection between May 1, 2016 through May 1, 2017."); Shaw Decl. ¶ 3 ("[C]reditors outsource their accounts to MNS for collection purposes.").

DNF is also a "debt collector" under the FDCPA. "[T]he relevant question in assessing a business's principal purpose is whether debt collection is incidental to the business's objectives or whether it is the business's dominant, or principal, objective." *McAdory*, 952 F.3d at 1093. DNF stipulates that in "2016 and 2017, the time period in which the conduct giving rise to Plaintiff's claim in this case occurred, approximately eighty-five percent (85%) of [its] revenue was derived from" third parties it hired to collect debts on its behalf. Jones Decl. Ex. 12, ECF 72-11. Because the evidence establishes that debt collection is DNF's dominant objective, DNF is a "debt collector" under the "principal purpose" prong of § 1692a(6). *Barbato v. Greystone All., LLC*, 916 F.3d 260, 267 (3d Cir. 2019), *cert. denied sub nom. Crown Asset Mgmt. LLC v. Barbato*, 140 S. Ct. 245, 205 L. Ed. 2d 129 (2019) ("As long as a business's *raison d'être* is obtaining payment on the debts that it acquires, it is a debt collector. Who actually obtains the payment or how they do so is of no moment.").

7 – OPINION & ORDER

Thus, the only remaining issues for the Court to decide are: (1) whether MNS violated a provision of the FDCPA and, if so, (2) whether DNF is vicariously liable for MNS's FDCPA violations under agency principles. The Court analyzes each in turn.

## I.    MNS's FDCPA Violations

Plaintiff argues she is entitled to summary judgment as to her claim against MNS because MNS violated the FDCPA by: (1) leaving a voicemail message that failed to include several statutorily-required disclosures and notices, included false or misleading representations, used unfair or unconscionable means to collect the debt, and was harassing and abusive; (2) unlawfully withdrawing the settlement amount from Plaintiff's bank account one day earlier than she authorized MNS to do so; and (3) failing to register as a debt collection agency as required by Oregon law. DNF does not oppose Plaintiff's motion to the extent it is directed at MNS's FDCPA violations.

On February 24, 2017, Plaintiff received the following voicemail message from MNS:

> Hello this message is intended for Jillian McDory [sic]. I'm calling in regards to asset verification and to confirm the address and place of employment. I was forwarded documentation at this verified name and Social Security number in regards to a process for enforceable review. Please be advised we are requesting fees assigned for and respond for required notice so before I go ahead and begin to schedule your document I wanted to inform you the process is being expedited and should commence within 24 to 48 hours from this point in time. Any questions contact an adviser directly at 877-937-0518, reference the file number 51839381.

McAdory Decl. ¶¶ 8-9, Ex. D at 1; Jones Decl. Ex. 9.

Plaintiff devotes 21 pages of briefing to explain the various ways MNS violated the FDCPA. Pl. Mot. Summ. J. 24-45, ECF 71. Having independently reviewed Plaintiff's arguments and supporting authority, the Court generally adopts Plaintiff's analysis and, for the

reasons explained in her motion,[1] finds Plaintiff has demonstrated that she is entitled to summary

judgment, except as to the following claims: (1) MNS's voicemail represented or implied that the

caller was a government affiliate in violation of 15 U.S.C. § 1692e(1); (2) the voicemail

contained a "false representation or implication that the consumer committed any crime or other

conduct in order to disgrace the consumer" in violation of 15 U.S.C. § 1692e(7); and (3) the

voicemail was harassing, oppressive, or abusive in violation of 15 U.S.C. §1692d. The Court

therefore grants Plaintiff summary judgment on her claims that MNS violated 15 U.S.C. §§

1692d(6), 1692e(2)(A), (3)-(5), (10), (11), 1692f(1), (6), 1692g(a).

## II.    DNF's Vicarious Liability Under the FDCPA

Plaintiff contends that DNF should be held vicariously liable for MNS's FDCPA

violations because, as a debt collector subject to the Act, DNF should bear the responsibility of

monitoring the activities of those it hires to collect debts on its behalf. Plaintiff also argues DNF

is vicariously liable under agency theories of implied actual authority, apparent authority, and

ratification. For its part, DNF contends that it cannot be held vicariously liable for MNS's

conduct because MNS was an independent contractor. DNF further argues that, even if MNS was

its agent in collecting Plaintiff's debt, it did not authorize or ratify MNS's FDCPA violations.

The Ninth Circuit explained that, on remand, "[i]f DNF is found to be a debt collector,

the next step—not yet reached by the trial court—will be to decide whether DNF is vicariously

liable according to agency principles." *McAdory*, 952 F.3d at 1097. As discussed, DNF is a "debt

---

[1] A district court may not grant an unopposed motion for summary judgment solely because the opposing party has failed to file an opposition. *See Cristobal v. Siegel*, 26 F.3d 1488, 1494-95 & n.4 (9th Cir. 1994); Fed. R. Civ. P. 56, advisory committee note of 2010 ("summary judgment cannot be granted by default even if there is a complete failure to respond to the motion"). The Court may only grant summary judgment if, as is the case here, "the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

collector" under the FDCPA and, therefore, may be held vicariously liable for MNS's violations

of the Act. The Ninth Circuit provided the following guidance:

> [W]e do not direct the district court on remand to discard the application of familiar
> principles of agency law when it addresses vicarious liability. Nor do we suggest
> that one businessperson may be liable for another just because they are in the same
> business. . . . On remand, the existing body of case law will govern the requirements
> of vicarious liability, and this opinion does nothing to alter that regime. *See,*
> *e.g.*, *Clark v. Capital Credit & Collection Servs., Inc.*, 460 F.3d 1162, 1173 (9th
> Cir. 2006) (holding that "general principles of agency . . . form the basis of
> vicarious liability under the FDCPA").

*Id.* at 1096-97.

The Ninth Circuit relies on the *Restatement (Third) of Agency* ("Restatement") for federal

common law agency principles. *See, e.g.*, *Henderson v. United Student Aid Funds, Inc.*, 918 F.3d

1068, 1073 (9th Cir. 2019); *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 448 (9th Cir.

2018); *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F. 3d 1045, 1054 (9th Cir. 2017).

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent

to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the

principal's control, and the agent manifests assent or otherwise consents so to act." Restatement

§ 1.01. "Whether an agency relationship exists is for a court to decide based on an assessment of

the facts of the relationship and not based on how the parties define their relationship."

*Henderson*, 918 F.3d at 1073 (citation omitted).

The essential elements of an agency relationship are (1) the principal's "right to direct or

control" the agent's actions, (2) "the manifestation of consent" by the principal to the agent that

the agent "shall act on his behalf," and (3) "consent by the [agent] so to act." *Meyer v. Holley*,

537 U.S. 280, 286 (2003). With respect to the acts of an agent giving rise to liability against the

principal, the principal may be held directly liable if the agent "acts with actual authority or the

principal ratifies the agent's conduct." Restatement § 7.03. The principal may also be held

10 – OPINION & ORDER

vicariously liable for the conduct of an agent where the agent acts with apparent authority on behalf of the principle. *Id.*

As a preliminary matter, the Court finds that there was a manifestation by DNF that MNS would act on DNF's behalf to collect its debts and that MNS consented to act on DNF's behalf. CSA ¶¶ 1-2. Therefore, the only issues the Court needs to decide are: (1) whether DNF had the right to direct or control MNS's debt collection activities, such that DNF and MNS were in an agency relationship; and (2) whether MNS acted with authority and/or DNF ratified MNS's conduct, such that DNF is liable for MNS's FDCPA violations. But before turning to those issues specifically, the Court analyzes DNF's liability under the Third and Seventh Circuits' recent approach for determining vicarious liability in the FDCPA context.

### A.      The Third and Seventh Circuits' Approach

Several circuit courts, including the Ninth Circuit, have indicated that a debt collector should be held vicariously liable for another entity's FDCPA violations committed in the course of collecting a debt on behalf of the debt collector. *Barbato*, 916 F.3d at 269; *Janetos v. Fulton Friedman & Gullace, LLP*, 825 F.3d 317, 325 (7th Cir. 2016); *Pollice v. Nat'l Tax Funding, L.P.,* 225 F.3d 379, 404-06 (3d Cir. 2000); *Fox v. Citicorp Credit Servs., Inc.,* 15 F.3d 1507, 1516 (9th Cir. 1994). These cases seemingly recognize that a showing of specific control is unnecessary because a principal-agent relationship exists, as a matter of law, where one debt collector hires another entity to collect debts on its behalf. *See*, *e.g.*, *Fox*, 15 F.3d at 1516 (holding a principal debt collector could be vicariously liable for an improper "venue decision made *solely*" by the attorney it hired to file a collection action on its behalf) (emphasis added); *Janetos*, 825 F.3d at 326 (adopting the logic of *Fox* and *Pollice* and rejecting the defendant's assertion that a "showing of actual control over the specific activity alleged to violate the Act" is

required to establish vicarious liability); *Barbato*, 916 F.3d at 269 (instructing the district court that, on remand, the plaintiff did not need to show that the principal debt collector "exerted actual control over [its agent] in order to be held vicariously liable"). And because an agency relationship exists, "it is a reasonable inference that one debt collector undertaking debt collection activities on behalf of another is acting within the scope of its [agency] authority," such that the principal is vicariously liable for its agent's FDCPA violations. *Plummer v. Atl. Credit & Fin., Inc.*, 66 F. Supp. 3d 484, 493 (S.D.N.Y. 2014) (citation omitted); *see also* Restatement § 1.01 cmt c. ("If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists. . . . [I]t is appropriate to infer that the action was taken as agent for the person who requested the action[.]").

The Third and Seventh Circuit's express reasoning, which the Court adopts here, is that "an entity that is itself a 'debt collector'—and hence subject to the FDCPA—should bear the burden of monitoring the activities of those it enlists to collect debts on its behalf." *Pollice*, 225 F.3d at 405; *Janetos*, 825 F.3d at 326 ("[I]t is fair and consistent with the Act to require a debt collector who is independently obliged to comply with the Act to monitor the actions of those it enlists to collect debts on its behalf."); *see also McAdory*, 952 F.3d at 1092 ("Because the statute is broadly remedial, we liberally construe the FDCPA in favor of consumers.") (citation omitted). "A debt collector should not be able to avoid liability for unlawful debt collection practices simply by contracting with another company to do what the law does not allow it to do itself." *Janetos*, 825 F.3d at 325; *Barbato*, 916 F.3d at 261 (finding a debt collector "cannot avoid the dictates of the FDCPA merely by hiring a third party to do its collecting"). Indeed, holding a debt collector liable for the actions of those it hires to act on its behalf promotes the

Act's primary goal of "eliminat[ing] abusive debt collection practices by debt collectors[.]" 15

U.S.C. § 1692(e); *see also Gonzales v. Arrow Fin. Servs., LLC*, 660 F.3d 1055, 1060-61 (9th Cir.

2011) (observing the FDCPA is a strict liability statute that "comprehensively regulates the

conduct of debt collectors, imposing affirmative obligations and broadly prohibiting abusive

practices") (citation omitted).

      This approach is consistent with the Ninth Circuit's earlier observation "that Congress

intended the actions of an [agent] be imputed to the [debt collector] client on whose behalf they

are taken." *Fox*, 15 F.3d at 1516. Although *Fox* discussed vicarious liability in the context of a

principal debt collector who hired an attorney to collect a debt on its behalf, the Court sees no

meaningful difference between the attorney-client relationship there and MNS and DNF's

agency relationship here. In both instances a principal debt collector used an agent debt collector

to act on its behalf but did not expressly authorize the agent's conduct that violated the Act. If

anything, it seems even more appropriate to hold a principal debt collector liable for its

subordinate debt collector's commonplace debt collection activities than to hold a client liable

for its attorney's acts. As the Ninth Circuit stated in this case, "an entity that otherwise meets the

'principal purpose' definition of debt collector cannot avoid liability under the FDCPA *merely*

by hiring a third party to perform its debt collection activities." *McAdory*, 952 F.3d at 1090

(quoting *Barbato*, 916 F.3d at 261) (emphasis added); *but see id.* at 1097-98 (criticizing the

*Pollice* approach) (Bea, J., dissenting).

      The Court therefore holds that DNF is vicariously liable MNS's unlawful collection

activities because MNS committed those violations while collecting a debt on DNF's behalf, and

DNF should bear the burden of failing to monitor the activities of those it contracts to carry out

its primary purpose. Accordingly, the Court grants Plaintiff summary judgment on her vicarious liability claim against DNF.

Nonetheless, because imputing an agent debt collector's conduct to its principal debt collector is not the law of the Ninth Circuit outside of an attorney-client relationship, the Court analyzes Plaintiff's arguments that DNF is vicariously liable under several express theories of agency liability. Under this approach, the Court must determine whether DNF retained enough control over MNS's activities to create an agency relationship, and whether DNF should be held vicariously liable because it authorized or ratified MNS's FDCPA violations.

### B. DNF's Right to Control

The parties disagree about the degree of control necessary to establish a principal-agent relationship in the FDCPA context. DNF argues that it can be held vicariously liable only if it generally controlled the manner and means of MNS's debt collection activities or specifically controlled MNS's conduct that violated the FDCPA. Plaintiff argues that the terms of the CSA and DNF's audit of MNS establish a sufficient level of control to find an agency relationship.

The Court first notes that "when Congress creates a tort action, it legislates against a legal background of ordinary tort-related vicarious liability rules and consequently intends its legislation to incorporate those rules." *Meyer*, 537 U.S. at 285. The Ninth Circuit's instruction to this Court to apply "the existing body of case law" to the issue of DNF's vicarious liability reflects this maxim. *McAdory*, 952 F.3d at 1096-97. As DNF notes, general agency principles provide "various avenues through which a principal can be held liable for the legal consequences of its agent's conduct," i.e., "the bedrock theories of agency: actual authority, apparent authority, ratification, and employment (respondeat superior)." *Jones*, 887 F.3d at 448-49 (9th Cir. 2018).

14 – OPINION & ORDER

DNF's argument that it must have controlled the manner and means of MNS's collection activities is necessary only to establish a respondeat superior theory of agency—which Plaintiff does not advance here. *See* Restatement § 7.07(3) ("an employee is an agent whose principal controls or has the right to control the *manner and means* of the agent's performance of work") (emphasis added), § 2.04 cmt. b (an employer's right to control its employees "is more detailed than the right of control possessed by all principals, whether or not employers"). Because Plaintiff is not seeking to hold DNF liable for MNS's conduct to the same extent that an employer would be liable for its employee's tortious conduct, DNF's "manner and means" argument is unavailing.

In contrast to the high degree of control a principal must possess to create an employer-employee relationship, the Restatement's general "control or right to control" requirement looks to the overall purpose of the agency relationship—here the collection of debts. *See* Restatement § 1.01 cmt. c ("If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists. . . . [A] person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment."). Further, a principal does not have to *actually* control an agent as a prerequisite for establishing a principal-agent relationship, rather the principal need only have "a *right* to control the actions of the agent." *Id.* (emphasis added).

Despite the CSA characterizing MNS as an independent contractor, the Court finds that DNF retained the right to control MNS to the degree necessary to establish a principal-agent relationship. *Id.* at § 1.02 (the parties' characterization of their relationship is not dispositive); *Henderson*, 918 F.3d at 1073; *see also U.S. v. Milovanovic*, 678 F.3d 713, 725 (9th Cir. 2012)

(finding an agency relationship even though the parties' agreements labeled them as independent contractors). "Control is a concept that embraces a wide spectrum of meanings, but within any relationship of agency the principal initially states what the agent shall and shall not do, in specific or *general terms.*" Restatement § 1.01 cmt. f(1) (emphasis added). "[C]ontrol assumes that the principal is capable of providing instructions to the agent and of terminating the agent's authority." *Id.* at cmt c. Principals "often retain agents to perform specific services." *Id.*

Under the CSA, DNF required MNS to collect debts on its behalf by "implement[ing] thorough collection procedures in the attempt to achieve maximum recovery of debts[,]" making "a reasonable number of telephone calls along with a reasonable number of mail efforts," and using "[s]kiptracing procedures . . . wherever necessary." CSA ¶ 2. The CSA also required MNS to "suspend" collection activity on any account upon DNF's request and allowed DNF to "recall any account that has been placed with [MNS] . . . at any time." *Id.* at ¶¶ 17-18; *see also* Restatement § 1.01 cmt. f(1) ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents.").

Even further, DNF reserved the right to "audit its accounts placed with [MNS] at any time," including "review of collection efforts, adequacy of cash controls, compliance with [the CSA], compliance with applicable regulations and statutes, and any other normal auditing procedures." CSA ¶ 11. In the 2016 audit, DNF noted that MNS's collection efforts needed much improvement with regard to consumer compliance, and that "simple guidelines [we]re not being followed." DNF Audit 1; Maczka Dep. at 144:24-152:14. DNF found MNS's "prelegal talk off . . . is aggressive" and "initial review suggests risk." DNF Audit 1. More importantly, the results of the audit also demonstrate that DNF had prior knowledge of the phone script MNS

used when initiating contact with debtors on its behalf. *Id.* at 3; Maczka Decl. ¶ 8, Ex. E at 4, ECF 69-5. Even though Shaw's voicemail deviated from the script in some respects, the script that DNF impliedly authorized MNS to use while collecting its debts still does not contain the disclosures required by 15 U.S.C. §§ 1692d(6) and 1692e(11).[2]

Finally, DNF also exerted control over MNS's debt collection activities by requiring MNS to notify it of any unauthorized access to its debtors' personal information, respond to consumer complaints, inform DNF of any potential legal claims, and by prohibiting MNS from reporting information to credit bureaus or referring an account for legal action without DNF's consent. CSA ¶¶ 8, 19, 24-26. DNF even prohibited MNF from settling a debt for less than a certain percentage unless DNF gave MNS "special permission" to settle a debt for less than the floor set in the CSA. *Id.* at ¶ 20; Maczka Dep. at 44:21-45:5. Because the undisputed facts demonstrate that DNF had a right to control MNS's debt collection activities to a significant degree, the Court finds that DNF and MNS were in a principal-agent relationship.

### B.    MNS's Authority and DNF's Ratification

Although a principal's degree of control over a specific activity is relevant to finding an agency relationship, a principal's control alone is insufficient to establish vicarious liability. *Jones*, 887 F.3d at 449. Rather, a principal is vicariously liable to a third-party for its agent's violative conduct where the agent acted with authority or the principal ratified the agent's acts. Restatement § 7.03. Plaintiff argues DNF is liable for MNS's FDCPA violations under the

---

[2] The Court finds unavailing DNF's argument that the script is akin to a third party "location information" communication permitted by § 1692b. The evidence demonstrates that the script is designed to be used when initiating contact with a debtor, which is precisely how it was used in this case. Mackza Decl. Ex. E at 4 ("Hello, this message is intended for (*Consumer Name*)") (emphasis added); Maczka Dep. 104:14-105:11, 106:3-10.

implied actual authority, apparent authority, and ratification theories of vicarious liability. The Court discusses each in turn.

### i.    Implied Actual Authority

Plaintiff asserts that MNS had implied actual authority from DNF to leave her the voicemail message that violated the FDCPA. The legal consequences of an agent's actions may be attributed to a principal when the agent has actual (express or implied) authority. *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 940 (9th Cir. 2017). "Express actual authority derives from an act specifically mentioned to be done in a written or oral communication," whereas "[i]mplied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction." *Id.* (citing *N.L.R.B. v. Dist. Council of Iron Workers of the State of Cal. & Vicinity* ("*Iron Workers*"), 124 F.3d 1094, 1098 (9th Cir. 1997)). Implied authority means actual authority either "(1) to do what is necessary, usual, and proper to accomplish or perform an agent's express responsibilities or (2) to act in a manner in which an agent believes the principal wishes the agent to act based on the agent's reasonable interpretation of the principal's manifestation in light of the principal's objectives and other facts known to the agent." Restatement § 2.01 cmt. b. Implied actual authority "is proved on the basis of a principal's conduct other than written or spoken statements that explicitly authorize an action." *Id.* at § 2.02 cmt. c.

The record indicates that DNF was generally aware that MNS's consumer compliance and collection methods needed improvement and presented risks, but there is no evidence that DNF expressly authorized MNS to use methods violative of the FDCPA in its collection activities. CSA ¶ 1 (prohibiting MNS from violating relevant laws and regulations). Further, whether MNS had implied authority to deviate from the script in ways that violated the FDCPA

or debit Plaintiff's bank account a day early would depend on MNS's interpretation of how DNF expected MNS to act when collecting on its behalf. As such, DNF's liability as to those violations is properly left to the trier of fact and is not appropriate for resolution at summary judgment. *See Hawaiian Paradise Park Corp. v. Friendly Broad. Co.*, 414 F.2d 750, 755 (9th Cir. 1969) (noting "[t]he determination of whether a principal has actual authority, express or implied, is primarily one of fact") (citation omitted).

The Court does find, however, that DNF impliedly authorized MNS to initiate contact with debtors, including Plaintiff, using a script that failed to include the disclosures required by 15 U.S.C. §§ 1692d(6) and 1692e(11). As previously noted, the record shows that DNF was aware of the deficient script when it audited MNS in 2016 prior to MNS's dealings with Plaintiff. DNF Audit 3; Jones Decl. Ex. 14 at 14, ECF 72-13; Maczka Decl. ¶ 8, DNF Resp. 11, ECF 75 (conceding that "the record evidence here irrefutably establishes that DNF was aware of the generic MNS message script"). As in *Ditty v. CheckRite, Ltd., Inc.*, DNF authorized MNS "to do its collection work and then knowingly stood by while the firm utilized" the legally deficient script. 973 F. Supp. 1320, 1334 (D. Utah 1997). By its acquiescence, DNF "impliedly authorized" MNS's use of the script "and thus is liable for any violations of law caused by the firm's use of those practices." *Id.*

### ii.    Apparent Authority

Plaintiff also argues that MNS acted with apparent authority from DNF when it violated the FDCPA. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement § 2.03. "Apparent authority results when the principal does

something or permits the agent to do something which reasonably leads another to believe that the agent had the authority he purported to have." *Salyers*, 871 F.3d at 940 (quoting *Hawaiian Paradise Park*, 414 F.2d at 756). A principal may be bound by an agent's actions that are outside the agent's actual authority if the principal allows the agent to appear to have the authority to bind the principal. *Iron Workers*, 124 F.3d at 1099.

"The principal's manifestations giving rise to apparent authority may consist of direct statements to the third person, directions to the agent to tell something to the third person, or the granting of permission to the agent to perform acts and conduct negotiations under circumstances which create in him a reputation of authority in the area in which the agent acts and negotiates." *Hawaiian Paradise Park*, 414 F.2d at 756. "Apparent authority results from the act of representing responsibility to others, and accordingly, cannot be avoided by private agreements between the principal and agent." *Newman v. Checkrite Cal., Inc.*, 912 F. Supp. 1354, 1371 (E.D. Cal. 1995). The third party's belief that the agent has authority must be objectively reasonable and traceable to the principal's manifestations. *Hawaiian Paradise Park*, 414 F.2d at 756; *Iron Workers*, 124 F.3d at 1099 (9th Cir. 1997); *see also Chinitz v. Intero Real Est. Servs.*, No. 18-CV-05623-BLF, 2021 WL 1375837, at *5 (N.D. Cal. Apr. 12, 2021) (noting "apparent authority uses an objective, 'reasonable person' standard") (citation omitted). Thus, Plaintiff must demonstrate that she reasonably believed that MNS had the authority to contact her, negotiate, and settle the debt on DNF's behalf, and that this belief is traceable to something DNF said or did.

Before MNS contacted her, Plaintiff had been informed on multiple occasions that DNF was the current creditor of her debt. McAdory Decl. Exs. B & C. Plaintiff was therefore already aware that DNF owned her debt when MNS—who knew where to reach Plaintiff and the precise

details of her debt—told her that it was negotiating and collecting the debt on DNF's behalf. McAdory Dep. 24:9-20, 25:3-8, 25:18-20, 26:2-5, 26:18-24, 47:18-21, 48:3-6, 66:19-67:4. Moreover, the file number left in the voicemail message was the same DNF file number referenced in the documentation Plaintiff received from First Choice and MNS. Jones Decl. Ex. 9; McAdory Decl. Exs. C, E, F, H. The Court therefore finds Plaintiff's belief that MNS was authorized to contact, negotiate, and collect her debt on DNF's behalf was objectively reasonable.

While DNF never communicated directly with Plaintiff, DNF authorized MNS to contact its debtors to negotiate and settle their debts on its behalf. Maczka Dep. 161:11-23 (noting DNF authorized MNS to negotiate debts on its behalf and that DNF was bound by MNS's settlement agreements). DNF acknowledges that its debt collection agents, like First Choice and MNS, must disclose to consumers that they are collecting on behalf of another entity, as MNS did in the subsequent phone calls and in its initial written communication with Plaintiff. Maczka Dep. 91:10-93-3, 110:6-21; McAdory Dep. 20:12-20, 43:9-12, 43:17-23, 66:19-67:4; McAdory Decl. Ex. E. Further, in requiring MNS to comply with the FDCPA, DNF expressly directed MNS to tell its debtors that MNS was settling their debts on DNF's behalf. CSA ¶ 1. Thus, Plaintiff's belief that MNS had the authority to act on DNF's behalf is directly traceable to DNF's manifestations, i.e., permitting MNS to "perform acts and conduct negotiations" with Plaintiff under circumstances indicating MNS had authority to collect and negotiate Plaintiff's debt in the manner that it did and directing MNS to tell Plaintiff that it was acting on behalf of DNF. *Hawaiian Paradise Park*, 414 F.2d at 756.

Because Plaintiff reasonably believed that MNS had the authority to act on behalf of DNF and that belief is traceable to the DNF's manifestations, Plaintiff has demonstrated that

MNS acted with apparent authority. *Newman*, 912 F. Supp. at 1371 ("[B]y allowing the [agents] to identify themselves to third parties as [its] representatives" the principal "has made itself responsible for the acts of the [agents] performed in the course of that representation."); *see also Salyers*, 871 F.3d at 940-41 (finding apparent authority liability in ERISA context where the principal insurance provider "played no part" in collecting documents from plan participants and required the agent employer to deal with them on its behalf). The Court therefore concludes that Plaintiff is entitled to summary judgment on her claim that DNF is vicariously liable for MNS's FDCPA violations.

### iii.    Ratification

Finally, Plaintiff contends that DNF ratified MNS's unlawful collection practices. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement § 4.01. A principal ratifies an act by either "manifesting assent that the act shall affect the person's legal relations," or by "conduct that justifies a reasonable assumption that the p[rincipal] so consents." *Id.*

There are two ways to prove ratification: (1) actual knowledge and (2) willful ignorance. Under the "actual knowledge" theory, a principal is liable if it knowingly accepts the benefit of the agent's act. *Henderson*, 918 F.3d at 1073. The plaintiff must point to evidence that the principal had knowledge of the act, exercised choice, and consented to the acts committed by the agent. *Id.* Under the willful ignorance theory, a principal assumes the risk of lack of knowledge when the plaintiff shows that the principal "'had knowledge of facts that would have led a reasonable person to investigate further,' but ratified [the agent's] acts anyway without investigation." *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010, 1015 (9th Cir. 2018) (quoting Restatement § 4.06 cmt. d).

As a preliminary matter, the Court finds that DNF knowingly ratified MNS's failure to give the disclosures required by 15 U.S.C. §§ 1692d(6) and 1692e(11). As already noted, DNF was aware of the script that MNS used to initiate contact with DNF's debtors when it conducted an audit of MNS. By failing to require MNS to correct the script, DNF knowingly accepted the benefit of MNS's failure to provide Plaintiff with the initial disclosures required by the FDCPA. Accordingly, to the extent DNF did not impliedly authorize MNS's violations of the notice requirements, DNF ratified them.

Plaintiff argues that, based on DNF's audit of MNS, DNF also knowingly accepted the benefit of, or was willfully ignorant to, DNF's other FDCPA violations. As mentioned, the 2016 audit showed that MNS was not following guidelines and its collection efforts were aggressive and needed improvement with respect to consumer experience and compliance. DNF Audit 1. Plaintiff notes that despite finding MNS's collection efforts were not entirely satisfactory, DNF consented to DNF's unlawful conduct by continuing to outsource approximately 13,304 debts to MNS for collection between May 2016 and May 2017. DNF Resp. Interrog. ¶ 8. In response, DNF argues that the general findings of its audit do not establish that it had actual knowledge that MNS was leaving the type of unlawful messages that Plaintiff received. DNF further disputes that its audit revealed the sort of "red flags" that would cause a reasonable person to investigate further.

Except for MNS's violations of Sections 1692d(6) and 1692e(11), the Court finds that the issue of DNF's ratification of MNS's conduct cannot be resolved at summary judgment. Although there is no direct evidence that DNF had actual knowledge of MNS previously committing such violations, there is circumstantial evidence from which the trier of fact could conclude that DNF knew MNS's "aggressive" tactics and inability to follow "simple guidelines"

encompassed the types of violations at issue here. *See Henderson*, 918 F.3d at 1075 (noting

"'[t]he fact that the principal had knowledge may be inferred' by circumstantial evidence")

(quoting Restatement § 4.06 cmt. b)). Similarly, the question of whether the results of the audit

raised the "sort of red flag that would lead a reasonable person to investigate whether [MNS] was

engaging in unlawful activities," is also a factual determination that can only be resolved by a

jury. *Kristensen*, 879 F.3d at 1015 (footnote omitted); *see also Henderson*, 918 F.3d at 1076

(noting question of the principal's willful ignorance presented "[t]riable issues of fact").

Nonetheless, because the Court has already determined that DNF is vicariously liable for MNS's

FDCPA violations pursuant to other agency principals, Plaintiff's alternative ratification theory

need not be resolved, and this case can proceed to a jury for a determination of Plaintiff's

damages.

## CONCLUSION

Plaintiff's Motion for Partial Summary Judgment [71] is GRANTED and Defendant

DNF's Motion for Summary Judgment [67] is DENIED. Therefore, the sole remaining issue in

this case is Plaintiff's request for damages under 15 U.S.C. § 1692k(a).

IT IS SO ORDERED.

DATED: _____ June 7, 2021 _____.


_____

MARCO A. HERNÁNDEZ
United States District Judge

24 – OPINION & ORDER